THE STATE v. RENFROW, *Appellant.*

Division Two, October 10, 1892.

1. **Constitution**: GREENE COUNTY CRIMINAL COURT: COLLATERAL ATTACK. The constitutionality of the existence of the criminal court of Greene county will not be determined in a collateral proceeding. (*State v. Wiley*, 109 Mo. 439.)

2. **Criminal Practice**: CHANGE OF VENUE: ARRAIGNMENT. A defendant in a criminal case may be arraigned and required to plead in the court to which the venue has been changed where the same is done before the trial is commenced.

The State v. Renfrow.

3. ———: HOMICIDE: KILLING PERSON NOT INTENDED. Where defendant in an attempt to kill a certain person by mistake accidentally kills another, the homicide thus committed is of the character that it would have been had the intention of the defendant been accomplished.

4. ———: DEFINITION OF TECHNICAL WORDS: INSTRUCTIONS. Where technical words are defined in certain instructions, they need not be again defined in other instructions in which they occur.

5. ———: INSTRUCTION: "SHOULD" AND "MIGHT." It is not error to use the word "should" instead of the word "might" in an instruction to the jury to take into consideration the fact as affecting the credibility of defendant that he is the accused party on trial.

6. ———: HOMICIDE: CONSTABLE MAKING ARREST. Where the defendant knew the deceased was a constable it is not error to instruct the jury that a constable has the right to arrest without warrant any person committing or attempting to commit an offense in his presence, and that, if they believed the defendant was committing an offense, at the time of the homicide, in the presence of the deceased, then the latter had the right to arrest him without warrant, especially where the officer was acting under an oral direction of a justice of the peace to make the arrest.

7. ———: ———: ———. Where it appears that defendant may have been justified in carrying a revolver because he had reason to believe that some person other than the deceased might attempt to kill him, such fact is no excuse for not submitting to a lawful arrest by deceased or for killing him.

8. ———: INSTRUCTIONS, MANSLAUGHTER. Where there is no evidence of manslaughter in any of its grades, it is proper to refuse to instruct on such offense.

*Appeal from Greene Criminal Court.*—HON. M. OLIVER, Judge.

AFFIRMED.

*James Orchard* and *L. O. Nieder* for appellant.

(1) The defendant should have been arraigned in the circuit court of Texas county. (2) The statute nowhere makes the constable a peace officer, and he is not authorized to arrest without warrant, except in case of felony. The court erred in giving instruction, num-

bered 12, for the state. (3) Instruction, numbered 14, for the state is also erroneous. (4) The court erred in refusing instructions asked by defendant. (5) The court should give instructions defining manslaughter where the evidence of the defendant goes to show manslaughter, although all other testimony goes to establish a different offense. *State v. Branstetter*, 65 Mo. 149; *State v. Johnson*, 76 Mo. 127; *State v. Dunn*, 80 Mo. 689; *State v. Wilson*, 98 Mo. 440.

*John M. Wood*, Attorney General, for the State.

(1) Instruction, numbered 10, given on the part of the state, was proper and clearly declared the law. There was not a particle of evidence in the case which, viewed from any reasonable standpoint, would have justified the court in instructing as to manslaughter in any degree. Under the evidence it was a case of murder or the act was done in self-defense. *State v. Edwards*, 71 Mo. 312; *State v. Ellis*, 74 Mo. 207; *State v. Anderson*, 86 Mo. 309; *State v. Green*, 66 Mo. 631; *State v. Weiners*, 66 Mo. 11; *State v. Hill*, 69 Mo. 451; 2 Bishop on Criminal Law, secs. 688, 689. (2) There was no provocation in this case which would reduce the killing from murder to manslaughter in either of its degrees. See cases cited above. (3) Constables have authority without a warrant to arrest those whom they see engaged in an affray or breach of the peace or otherwise violating the law; and, in the giving and refusing of the instructions by the court relative to this feature of the case, no error was committed. *State v. Holcomb*, 86 Mo. 371; *State v. Green*, 66 Mo. 649; 2 Bishop on Criminal Law, secs. 652, 655; 1 Bishop on Criminal Procedure, sec. 181, *et seq*. Besides, it appeared in the evidence that the justice, who was present, ordered defendant's arrest,

which he was fully authorized to do under the circumstances. Revised Statutes, sec. 4014; 1 Bishop on Criminal Procedure, sec. 178. (4) Instruction, numbered 14, as here given, relative to the credibility of defendant's testimony was approved by this court in the case of *State v. Young*, 99 Mo. 666.

MACFARLANE, J.—Defendant was indicted in the circuit court of Texas county for the murder of Charles D. Dorris. On his application a change of venue was awarded to the criminal court of Greene county, in which he was tried, found guilty of murder in the first degree, and sentenced accordingly. From this judgment he appeals to this court.

The evidence on the part of the state shows, in substance, that on the eighteenth day of July, 1888, in the town of Summerville, Texas county, Missouri, about six o'clock in the afternoon, a difficulty and fight occurred between Billy Renfrow, a brother of defendant, and a man named Hughes. Deceased, who was then constable of the township, with one McCaskell, separated the parties, and was standing with his hand on the arm of Billy Renfrow. A crowd of fifteen or twenty persons had collected around these parties, when defendant was observed by P. P. Baskett, justice of the peace of the township, approaching the crowd with a pistol in his hand down by his side. The justice went towards deceased and called out, "Arrest that fellow with a revolver!" Some say he called to deceased to arrest him, others, that he called to some one to arrest the man with the pistol. Defendant then put his hand, in which he held the pistol, under his coat, and started through the crowd, deceased following him. They both passed the crowd and were about thirty feet apart, when deceased, walking after defendant, beckoned and called to him, saying, "Hold on,

Peter, hold on," at which defendant turned partly around, leveled and fired his pistol, striking deceased in the head, from the effects of which he died in about an hour.    Defendant immediately fled, but returned in a few days and gave himself up.    He afterwards escaped from jail, but was recaptured.

As defendant undertakes to justify the homicide, the full abstract of his testimony will be given.    He testified in substance:  I am the defendant in this case. I was in Summerville in 1888.    I was present when Dorris was killed.    I was present at the time of the difficulty between Billy Renfrow and John Hughes.    I did not see Charles Dorris at first.    I saw him take hold of my brother.    Tom Allen, Charles Cleveland, John Cleveland and Cliff Spence are all that I remember being right there.    The Cleveland boys were armed. I could not swear positively whether Harvey Burris was or not.  'I watched him all day.    We had a few words in reference to a difficulty we had Sunday week before that.    At the time Billy was into the difficulty Charles Dorris came up and took hold of Billy.    That is the first time I drew my pistol.    When these parties rushed up there, I pulled the pistol out of my pocket and dropped it down by my side.    Some man said something about some fellow having a revolver.    I turned around the crowd.    Went around the biggest part of the crowd and started eastwards and passed right by Harvey Burris.  I heard somebody say, "Arrest that fellow; he has got a revolver."   I thought it was Charles Dorris told Burris to catch him. ' I saw Burris start towards me.    I thought he had something in his left hand and his right hand in his pocket, and I turned around and shot.    I shot at Burris.    I was told fifteen minutes before that that Burris said he would kill me.    I was told about fifteen minutes before that

Burris had said right there that he would take my life before the sun went down. Tom Newallen was the man that told me that. I did not shoot at Dorris. I did not hear that I had killed Dorris till Friday morning. I thought I shot Burris all the time. I was on the go when I shot. When the pistol fired I was still going. I saw there was a big crowd after me. Friday morning I came in home and my mother told me I had killed Charles Dorris. My feelings toward Charles Dorris were good. I had no hard feelings towards Charles Dorris in any respect.

Cross-examination: It was Friday morning before I knew Dorris was killed. I left and went to the woods and never came in till Friday morning. I was at home when Dorris arrested my brother. I knew he was an officer. He was acting as constable at the trial in this case. I knew before the shot was fired. At the time I shot I intended to shoot Harvey Burris. He was a little back of Charles. I did not see Charles till he got out of the crowd, then I saw him. I heard him say something like, "Hold up, Peter." I did not know for certain it was Charles. When he said "Hold up there, Peter," I fired. I did not see Charles Dorris at the time I shot. I meant to shoot toward Harvey Burris. I knew Charles Dorris was following me. I was looking back and looking forward all the time. I knew Charles Dorris and Harvey Burris well. They did not look anything alike. At the time I drew that pistol Charles Dorris had hold of my brother. I knew Charles Dorris was not an enemy of my brother's. I thought he was his friend. I passed through the crowd and went on the north side and started east. When I passed Burris I heard him say, "Catch him, Harvey." He was walking toward me and had something in his hand and started to his hip pocket. That is all I saw. I could not say positively whether he had

a revolver or not. There was a bulk of something in his hip pocket. I could not tell whether it was a revolver or what it was. Burris and I had some words there that day. We made friends once. My brother came on to him about what he had said about him to me. My brother had nothing to say to him before that. We did not make friends there and take a drink; that is, he, my brother and I. He and I made friends. Excepting what Burris had said about my brother, they were friends.

Burris testified that he was following defendant but stopped when he turned, deceased followed on, and that he was ten or twelve feet from deceased when he was shot.

The court gave to the jury the usual instructions for murder in the first and second degrees; with these no objection is found.

Defendant objects to instructions 10, 11, 12 and 14 which are as follows: "10. The court instructs the jury that if, from the evidence, you believe that the defendant at the county of Texas, in the state of Missouri, unlawfully, wilfully, premeditatedly, deliberately, on purpose and of his malice aforethought, shot at Harvey Burris with the intention of killing him, but missed him and shot and killed Charles B. Dorris, as charged in the indictment, then you will find him guilty of murder in the first degree.

"11. The court instructs the jury that if from the evidence they believe that the defendant at the county of Texas, in the state of Missouri, unlawfully, wilfully, premeditatedly, on purpose and of his malice aforethought, shot at Harvey Burris with the intent of killing him, but missed him and killed Charles B. Dorris, as charged in this indictment, then you will find him guilty of murder in the second degree.

"12. The court further instructs the jury that a

constable, under the law, has the right to arrest without warrant any person committing or attempting to commit an offense in his view or presence. So if you shall believe from the evidence in the case that the deceased, Charles B. Dorris, was the constable or acting constable of Carroll township, Texas county, Missouri, and that the defendant in this case was committing an offense against the laws or was about to commit an offense in the presence and in the view of the said Charles B. Dorris, in said township and county, then you are instructed that Charles B. Dorris had the right and it was his duty to arrest the defendant at the time without warrant."

"14. The court instructs the jury that the defendant is a competent witness in this case, yet, in considering what weight and credibility you will give to his testimony in making up your verdict, you should take into consideration the fact as affecting his credibility that he is the accused party on trial."

I. The constitutionality of the act of the general assembly, creating and establishing the criminal court of Greene county, is again challenged on the ground that said county had not fifty thousand inhabitants, which population was necessary to entitle it to a separate criminal court.

It has been settled by this court in some recent decisions, that, until the state, in some appropriate and direct proceeding, shall question the constitutionality of said act, it will be assumed that the legislature acted upon proper information, and that the county had the requisite population, and no inquiry into the fact will be permitted in these collateral proceedings. *State v. Wiley*, 109 Mo. 439; *State v. Searcy, ante*, p. 236.

II. Defendant was not formally arraigned, so far as the records shows, and called upon to plead, until

after his case had reached the criminal court of Greene county to which it had been transferred by change of venue on his application. Objection is now made that the arraignment could only have been made in the court in which the indictment was found.

We can see no merit in this objection. It is only necessary under our statute that the arraignment be made and the plea entered before the trial commences. *State v. Saunders*, 53 Mo. 236, and cases cited. After the court has acquired jurisdiction of a criminal case, by a change of venue, "the same proceedings shall be had in the case in such court, in the same manner and in all respects, as if the same had originated therein." Revised Statutes, 1889, sec. 4167. This broad provision of the statute furnishes ample authority for entering a plea of not guilty in the criminal court of Greene county.

III. There was no error in giving instructions 10 and 11. Where a person in an attempt to kill one, by mistake accidentally kills another, the law transfers the intent of the act to such person so killed, and a homicide thus committed will be of the grade and degree that it would have been had the intentions of the assailant been accomplished. *State v. Henson*, 81 Mo. 387; *State v. Montgomery*, 91 Mo. 52; *State v. Payton*, 90 Mo. 221.

IV. It is insisted that the technical words malice, premeditation and deliberation, as used in instructions 10 and 11, should have been defined. These words were properly defined in connection with the instructions predicated upon the evidence bearing upon the intentional killing of deceased; and there was no need to re-define them in connection with these instructions. The meaning as used in all the instructions was the same.

V.   The objection to instruction 14 is that the jury were told that they "should" instead of "might" take into consideration the fact, as affecting the credibility of defendant, "that he is the accused party on trial." A similar instruction was criticised by Judge SHERWOOD in *State v. Young*, 99 Mo. 666, on the ground that the direction by the court to the jury that they "should" consider any particular fact, in weighing the testimony, was a commentary upon the evidence and in violation of an express statute.   Sec. 4220.   The majority of the court, as then constituted, approved the instruction; and this division of the court has unanimously followed the ruling of the majority in the same case reported in 105 Mo. 638.

VI.   There was no error in giving instruction 12 in reference to the right and duty of the constable to make arrest of persons committing misdemeanors in their presence.   He is a common-law officer and his authority, without special statute, "is reasonably well settled." *State v. Holcomb*, 86 Mo. 379; *State v. Green*, 66 Mo. 649.

In speaking of the authority of sheriffs, constables and such officers, Bishop says:  "Since these officers are, in a sense, conservators of the peace, they may, by virtue of their office, exercise whatever force necessary to prevent crime, either by arresting the offenders or by seizing and detaining the instrument of crime. Therefore, in general, they may arrest persons committing any sort of indictable wrong in their presence." Bishop on Criminal Procedure, sec. 183.

Moreover, deceased in this case had, in addition to his official authority, for attempting to arrest defendant, the verbal order of the justice of the peace, who is made a conservator of the peace by statute, with full "power and jurisdiction to cause to be kept all laws made for the preservation of the public peace, and to

issue orders for the immediate apprehension of persons charged with criminal offenses." Revised Statutes, sec. 4008. There is no doubt that at common law, if a violation of the law is committed in the presence of a justice of the peace, "he may as well by verbal order as by warrant command the arrest of the offender." 1 Bishop on Criminal Procedure, sec. 178; *State v. McNally*, 87 Mo. ,651; *State v. Green*, 66 Mo. 649. The official character of the officer was known to the defendant, and he should have submitted to his authority.

VII. Defendant undertook to excuse and justify himself for carrying a pistol, and for drawing it on the occasion, upon the ground of the existence of a feud between Dink, John and Charles Cleveland, Harvey Burris and John Hughes on the one side, and defendant, his brother and George and Alfred DeWoody on the other side, and that the Cleveland boys had made threats of violence against him, and that he had reason to believe that such threats would be carried into execution. Instructions were also asked asserting the proposition that, under such circumstances as were shown by the evidence, defendant had the right to arm himself, and carrying a pistol on the day of the homicide was no violation of the law.

These facts may have availed the defendant as a defense in a prosecution for carrying concealed weapons had he been arrested and tried for that offense, but we are unable to see that it was the least justification for the homicidal act, or excuse for the refusal to submit to the lawful authority of the officer of the law.

VIII. The defendant insists that the jury should have been instructed that, if he shot at Burris and did so, under such conditions as would have been justifiable had he struck and killed him, then he was also excusable in unintentionally killing deceased.

Without attempting to go into a discussion of the legal principles involved in this proposition, we deem it sufficient to remark that neither the officer who was killed, nor Burris, whom defendant claims he intended to kill, even under the evidence of defendant himself, was in a situation to have carried out any design to do defendant any great personal harm. Defendant says in his testimony "that Burris had something in his left hand, and his right hand was in his pocket, and something bulky seemed to be in the pocket, though he did not profess to know what it was." It is admitted that the parties were thirty feet apart, with open ground for the escape of defendant there could have been no cause to apprehend immediate danger from Burris under the circumstances as detailed by defendant himself. No apparent necessity for the act was shown. *State v. Wilson*, 98 Mo. 446. Indeed, after killing the constable he easily made his escape from the whole crowd, although many of those composing it followed and attempted to arrest him.

Under the evidence also there was no manslaughter in any of its degrees in the case, and the court properly declined to instruct the jury as to that grade of homicide. It is only proper to give instructions defining each crime, of which, under the indictment, the accused could be convicted "when there is evidence of such crime in the case." This is as far as the authorities cited by defendant's counsel go. *State v. Branstetter* 65 Mo. 149; *State v. Johnson*, 76 Mo. 127.

Finding no error in the record, we affirm the judgment. All concur.